In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4164

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

*Plaintiff-Appellee,*

*v.*

PHOENIX INTERNATIONAL SOFTWARE, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07 C 665—**Barbara B. Crabb**, *Judge.*

ARGUED JUNE 4, 2009—DECIDED DECEMBER 28, 2010

Before FLAUM, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Phoenix International Software created software that it called Condor and registered the CONDOR mark with the Patent and Trademark Office (PTO) for "computer software for on-line programming development, library management and system utilities functioning on mainframe systems." Phoenix used this mark since June 1978 and registered it in January 1997.

The delay in registration was due to a prior, separate registered CONDOR mark not at issue here. (We are capitalizing CONDOR when we refer to the mark, as the parties have in their briefs.)

The Board of Regents of the University of Wisconsin System (to whom we will refer simply as Wisconsin, because it is an arm of the state) registered its own CONDOR mark with the PTO in 2001 for "computer network operating system software, downloadable from a global computer network, that delivers large amounts of computational power by utilizing idle computing resources in a network of individual computer workstations . . . ." The question in this case is whether Wisconsin's CONDOR mark is likely to be confused with Phoenix's.

Phoenix filed a petition before the Trademark Trial and Appeal Board (TTAB) to cancel Wisconsin's registration on the grounds that Wisconsin's registration would create confusion in trade. *See* 15 U.S.C. § 1064 ("A petition to cancel a registration of a mark . . . may . . . be filed . . . by any person who believes that he is or will be damaged . . . by the registration of a mark on the principal register . . . ."). The confusion in trade allegation refers to 15 U.S.C. § 1052(d), which forbids the registration of a trademark that "[c]onsists of or comprises a mark which so resembles a mark registered in the [PTO] . . . as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive . . . ."

The TTAB granted the petition and cancelled Wisconsin's registration, finding that

> the marks are identical in every aspect. In such cases, even when goods or services are not competitive or intrinsically related, the use of identical marks can lead to an assumption that there is a common source . . . . In addition, the parties' software performs similar functions and, therefore, we cannot find that they are used in unrelated fields. Even sophisticated purchasers would likely believe that there is some relationship or association between the sources of the goods under these circumstances.

*Phoenix Software Int'l v. Bd. of Regents of the Univ. of Wis. Sys.*, Cancellation No. 92042881, at 19 (T.T.A.B. Sept. 26, 2007) (quotations and citations omitted).

Wisconsin brought a civil action in federal district court pursuant to 15 U.S.C. § 1071(b) challenging the TTAB's decision. Phoenix counterclaimed, seeking damages from Wisconsin for trademark infringement and false designation of origin under the Lanham Act (15 U.S.C. §§ 1114, 1125(a)); it also raised state law claims that it later voluntarily dismissed with prejudice. The district court dismissed Phoenix's federal counterclaims on sovereign immunity grounds and granted Wisconsin's motion for summary judgment, reversing the TTAB's determination. Phoenix appeals.

## I. Standard of Review

The standard of review in this case is complicated by its initial status as a matter before the TTAB. After losing

there, Wisconsin had two options: take an appeal directly to the Court of Appeals for the Federal Circuit or institute an action in a district court. *See* 15 U.S.C. § 1071. The procedure for appeal to the Federal Circuit conforms to the familiar standard for administrative appeals. The parties present their case based on the closed record developed before the TTAB and the circuit court determines whether substantial evidence before the TTAB supported the decision. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673, 675 & n.9 (7th Cir. 2001).

The choice to institute an action in the district court allows Wisconsin the benefit of expanding the record by offering new evidence to fend off Phoenix's cancellation claim. We have described the district court option as "both an appeal and a new action, which allows the parties to request additional relief and to submit new evidence." *Id.* at 673; *see also Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 12-13 (D.C. Cir. 2008) ("[T]he court may consider both new issues and new evidence that were not before the TTAB."). But a court's posture when considering an appeal and new issues is different, particularly in terms of issues of fact, which we will see are the key issues in this case. There is tension between the level of deference an appellate court pays to the fact-finder (in this case, an administrative body) and the parties' opportunity to present new evidence. *See CAE*, 267 F.3d at 674 ("[T]he district court is an appellate reviewer of facts found by the TTAB and is also a fact-finder based on new evidence introduced to the court.").

The district court, relying on *CAE*, adopted a deferential substantial evidence standard to review the TTAB's findings. *See id.* at 676. The court described its role as one that "affords deference to the findings of fact made by the board but considers the board's decision de novo to the extent the parties present new evidence. The board's findings of fact are properly reviewed under the standard set forth in [the Administrative Procedure Act (APA)] which requires the court to set aside findings and conclusions 'unsupported by substantial evidence.'" *Bd. of Regents of the Univ. of Wis. Sys. v. Phoenix Software Int'l, Inc.*, No. 07 C 665, 2008 WL 4950016, at *8 (W.D. Wis. Nov. 18, 2008) (citing *CAE,* 267 F.3d at 674, 675-76). The district court's formulation of the interplay between both sets of evidence matches ours. "Although the district court's review of the TTAB's decision is considered de novo when the parties present new evidence and assert additional claims, the district court also must afford deference to the fact findings of the TTAB." *CAE*, 267 F.3d at 674. (We note, however, that the D.C. Circuit has recently held that because the Lanham Act, 15 U.S.C. § 1071(b), provides for judicial review of TTAB decisions, the APA is not directly applicable. *See Aktieselskabet*, 525 F.3d at 14. The D.C. Circuit did not address how this would affect its deference to the TTAB's fact-finding, except to note that courts have interpreted *Dickinson v. Zurko*, 527 U.S. 150 (1999), as requiring the application of the APA's substantial evidence standard to TTAB decisions. *Aktieselskabet*, 525 F.3d at 14 & n.2. We are one such court, *CAE,* 267 F.3d at 675, and neither party has made an issue of our standard of review.)

So an important part of this case should be to delineate the specific factual findings of the TTAB to which we owe deference and the new evidence, which we view in favor of the nonmoving party on a motion for summary judgment, and assess the impact of each on the summary judgment standard. Given that Phoenix was the prevailing party before the TTAB and that it was the nonmoving party on the summary judgment motion that was granted, we must say at the outset that the state of the facts presents a real obstacle to summary judgment in Wisconsin's favor. A party is entitled to summary judgment only if there exists "no genuine issue of material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The entire issue in this case—the likelihood of confusion—is an issue of fact. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008); *CAE*, 267 F.3d at 677; *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000); *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 912 (7th Cir. 1996); *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1167 (7th Cir. 1986).

To overturn the TTAB's decision, therefore, the district court (and this court, on de novo review) must find that substantial evidence did not support the TTAB's determination, or that a legal error clouded its understanding of the likelihood of confusion issue. If the TTAB's determination is supported by substantial evidence and there is no undermining legal error, Wisconsin must show that there is a killer set of facts, that Wisconsin neglected to bring to the TTAB's attention, that resolves the case in its favor even if we credit all the

facts the TTAB found during its proceedings. To win on summary judgment, Wisconsin must show that the TTAB was not merely wrong, but wrong as a matter of law, and that the evidence was not only not substantial enough to support its decision but that the evidence compelled, without a new hearing by a fact-finder, the conclusion opposite to the TTAB's determination. (We ordinarily do not allow a party to hold evidence in reserve for appeal, but our standard of review is prescribed by the Lanham Act, 15 U.S.C. § 1071(b)(1). As the D.C. Circuit noted, the Lanham Act "does not require exhaustion of the administrative procedures itself" and therefore does not impose the traditional waiver rules on parties appealing TTAB decisions to the district court. *Aktieselskabet*, 525 F.3d at 14.)

We now proceed to the analysis. Only if the record, as credited by the TTAB and supplemented by the parties in the district court, reveals no genuine issue of material fact may we affirm the district court's decision.

## II.  Relevant Findings

### A.  Trademark Trial and Appeal Board

The TTAB found that Wisconsin's software "involve[s] using individual workstations in a network to better utilize idle computing resources," while Phoenix's software "functions on a mainframe system and . . . provides online programming development, library management and systems development." *Phoenix Software Int'l*, Cancellation No. 92042881, at 10. Before the TTAB was testi-

mony from Wisconsin's mainframe coordinator that "an organization that did not have a mainframe or is not involved in developing software application[s] for mainframe computers" would have no use for Phoenix's software and testimony from Wisconsin's software creator that established that its software was not used on mainframe computers. ("[N]one of the [Wisconsin] Condor users that came back to us and asked any question told us that it's installed on a mainframe.")

But Phoenix presented evidence that its software, at least, was usable beyond the mainframe environment. Its sole shareholder, Fred Hoschett, testified in a deposition that "effectively we can run our software, unchanged, unaltered on a workstation, on someone's desktop, as if it were on a mainframe" and that the software "often" operates on a network of workstations, which he defined as a "LAN, WAN or some other network that allows the interconnection of these workstations." (LAN is an acronym for Local Area Network; WAN is an acronym for Wide Area Network.) He also testified that he has "many customers that use Condor that do not have mainframes."

In his deposition, Hoschett also read Wisconsin's description of its software from the University's web site:

> Condor is a specialized workload management system for computer-intensive jobs. Like other full-featured batch systems, Condor provides a job queuing mechanism, scheduling policy, priority scheme, resource monitoring, and resource management. Users submit their serial and

> parallel jobs to Condor. Condor places them into a queue, chooses when and where to run the jobs based upon a policy, carefully monitors their progress, and ultimately informs the user upon completion.

Hoschett testified that this language "very much" concerned him because when he first read Wisconsin's description of its software he initially thought it was describing his product. Before the TTAB, Phoenix described its software as "a toolbox of functionality to be used essentially by anyone who uses a computer to assist them in doing their jobs, whether it be programming software, submitted batch jobs and queuing batch jobs, or managing the environment or managing the resources."

Based on this evidence, the TTAB found that there was "at least some evidence in the record that the parties' respective software performs the same general functions and the evidence does not demonstrate the goods are used in distinctly different fields," and that "there is no clear division between the parties' software that would cause us to conclude that these products are not related." The biggest difference between the products the TTAB found was that Phoenix's software was "used in a mainframe environment while [Wisconsin's] goods are used in a network of individual computer workstations." That distinction was "not necessarily" significant, because as one of Wisconsin's witnesses conceded, "there might be some incentive" to operate "in both environments."

The TTAB further found that both programs were "downloadable" and nothing in Phoenix's registration

indicated otherwise, that consumers of either program were not ordinary consumers and had "some level of skill and sophistication to the extent that they are programming mainframe computers or networking computer workstations to increase computational resources," and that their "purchases would be made with some care." (The TTAB classified consumers of both programs as purchasers, even though Wisconsin distributes its software under an open source, free license. This difference is irrelevant to our analysis.) The TTAB also found that there was no evidence that any consumer was actually confused as to the source of either product despite evidence that Phoenix offered to support its claim to the contrary (including Internet searches for "Condor Software" that returned results for both products and a Wikipedia entry for Wisconsin's product, with no entry for Phoenix's).

The TTAB found that both parties' marketing practices were "relatively limited." A Wisconsin witness testified that "[w]e don't do any advertising with Condor" and Phoenix's controller estimated that Phoenix spent approximately $65,000 in marketing, focused on attending trade shows and printing brochures and other marketing materials. But Wisconsin told the TTAB that it was expanding its operations, which the TTAB found made the chances of confusion more likely.

Based on these factual findings and inferences drawn therefrom, and applying relevant law, the TTAB found that Phoenix had met its burden of proving the likelihood of confusion and granted Phoenix's petition to

cancel Wisconsin's registration of the CONDOR mark. It noted that "the marks are identical in every aspect" and that both products perform similar functions. The TTAB concluded that "we cannot find that they are used in unrelated fields" and that "[e]ven sophisticated purchasers would likely believe that there is some relationship or association between the sources of the goods under these circumstances."

## B.  District Court

At the district court, Phoenix attempted to further supplement the record with evidence that bolstered its case that the Condor software products performed overlapping functions. Wisconsin, according to Phoenix's sole shareholder Fred Hoschett, had struck deals with IBM to make Wisconsin's version of Condor available on PC-based mainframes. Hoschett also provided a list of customers operating Phoenix's version of Condor on PC-based mainframes. But the district court rejected the proffered evidence on the grounds that it was filed with Phoenix's reply brief instead of in its initial proposed findings of fact, in violation of a local rule. Phoenix does not argue that it did, in fact, comply with the local rule.

Based on the evidence it did consider, the district court found that it was undisputed that Phoenix's software cannot run on a network of workstations that are not connected to a mainframe system, but that the software may be run on non-mainframe computers through the use of emulation software. The court found that the Phoenix software allows "its users to submit

batch jobs to local and remote computers through a network of computers to more effectively utilize and balance the available computing cycles," that Phoenix had 100 or fewer active licensees of its software, but that licenses cost anywhere from $30,000 to $300,000 a year (so that 100 licenses can be very profitable), and that Phoenix advertises at trade shows, on the Internet, and through brochures.

Phoenix's customers, the court found, must be specialized because mainframe computer systems "are generally expensive computing systems that are extremely reliable and secure and capable of enormous throughput," they are "centrally managed and maintained," and a choice of software for use on a mainframe "requires careful consideration." In other words, customers don't buy mainframe software on a lark. The end-users of software like Phoenix's are "mainframe systems administrators and mainframe systems application developers." The community of mainframe administrators and developers is a tight-knit one (in the words of the district court, a "niche") that learns about products through word-of-mouth advertising, mainframe trade shows and conferences, and the advice of consulting firms. Phoenix spent approximately $65,000 on marketing in 2000; that number was virtually unchanged in 2003. Phoenix's competitors are IBM and Computer Associates.

As for distribution and customer overlap, the district court found that Wisconsin distributes its software under an open software license and links together "a

network of individually owned computer resources" to create a system wherein those computers trade operating capacities. The court determined that Wisconsin's software does not run in mainframe environments, but did not resolve whether a mainframe could be part of the grid on which Wisconsin's software operates. The court found that users of Wisconsin's software are generally systems operators of scientific research groups, but since the software is free and available for download others may use it. Because of this, the court found that users of Wisconsin's software are tough to identify; Wisconsin's estimates place the total number of users in the tens of thousands. They generally must have a "systems-level understanding" of computers in order to make Wisconsin's Condor program work. Users include the "high energy physics community, the DOE [Department of Energy] National labs, biology and computer science departments, and industrial groups." According to the district court, 3738 copies of Wisconsin's software were downloaded in 2000; by 2004, the number of downloads grew to 15,155, an increase of more than 400 percent. A promotional program offered by the University of Wisconsin, "Condor Week," showed similar growth from a one-day event attracting twenty participants (presumably it was then called "Condor Day") to a four-day event with more than 150 participants.

### III.  Likelihood of Confusion

The question here is whether consumers were likely to be confused by Wisconsin's and Phoenix's concurrent

use of the CONDOR marks. As the district court framed it, "the only question is whether the identical marks used in the general field of computing create a likelihood of confusion for consumers . . . or whether the differences in the computer products for which the software is sold, in the trade channels, in the conditions under which sales of products are made and other factors eliminate the possibility of confusion . . . ." *Bd. of Regents of the Univ. of Wis. Sys.*, 2008 WL 4950016, at *1. The district court found that the TTAB "erred when it considered the actual nature of the parties' goods and misapplied the burden of proof to its determination of a likelihood of confusion." *Id.* Because it determined that the TTAB opinion was erroneous, and Phoenix's evidence before the district court was relevant only to the analysis adopted by the TTAB, the district court found for Wisconsin.

We agree that the key issue in this case is the likelihood of confusion between the products described by the two marks. We are not considering whether the products themselves perform the same functions, but whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source. *AutoZone*, 543 F.3d at 931. "[D]issimilarity is not dispositive of the likelihood of confusion inquiry. A likelihood of confusion may exist even if the parties are not in direct competition or their products and services are not identical. Rather, because the rights of an owner of a registered trademark extend to any goods that might be, in the minds of consumers, 'related,' i.e., put out by a single producer, the

more accurate inquiry is whether the public is likely to attribute the products to a single source." *CAE*, 267 F.3d at 679 (citations omitted). This, as we shall see, is a key point of divergence between our analysis and that of the district court.

There are a series of multiple-factor tests that are used across the circuits to determine the likelihood of confusion. We use this one:

   1.   Similarity between the marks in appearance and suggestion.

   2.   Similarity of the products.

   3.   The area and manner of concurrent use.

   4.   The degree of care likely to be exercised by consumers.

   5.   The strength of the plaintiff's mark.

   6.   Whether actual confusion exists.

   7.   Whether the defendant intended to "palm off" his product as that of the plaintiff.

*See AutoZone,* 543 F.3d at 929. The Federal Circuit uses a different set of factors (referred to by the TTAB in its opinion). *See In re E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973). They essentially cover the same ground as our factors, and neither party suggests that the differences between the factors affect the outcome of the case. As noted above, likelihood of confusion is a question of fact for the jury to determine. *AutoZone,* 543 F.3d at 929. "The question of fact may be resolved on summary judgment only if the evidence is

so one-sided that there can be no doubt about how the question should be answered." *Id.* (quotations omitted).

The district court overruled the TTAB in two key respects. First, it found that the TTAB erred when it considered the "actual nature of the parties' goods" rather than the goods as they were described in their respective registrations. This error, the court found, combined with the lack of evidence that the products were sufficiently related to cause confusion, removed a key rationale that supported the TTAB's decision. The district court also found that the TTAB erred in placing the burden on Wisconsin to prove that the parties' goods are distinct when it considered the way the products were used or sold. The district court found that the burden should have been placed on Phoenix, who sought to cancel a presumptively valid registered mark, and found that Phoenix did not present sufficient evidence to meet this burden (because the district court rejected all the TTAB's findings on the products' similarities as irrelevant).

The district court's analysis addressed several factors outlined in our test, but focused mainly on the similarity of the products and the area and manner of their use. Wisconsin does not (and cannot) dispute that the marks are identical and Phoenix has not been able to press the argument that actual confusion existed between the two marks—the TTAB found otherwise and evidence to the contrary was excluded by the district court. Fundamentally, then, the district court's rejection of the TTAB's decision rested on a disagreement with its

analysis of the products' similarity and their manner of use.

The district court examined the manner in which both products were described in their registrations, disregarded most evidence of their actual use, and focused on whether a sophisticated consumer would be likely to confuse the product described as "computer software for on-line programming development, library management and system utilities functioning on main-frame systems" with a product described as "computer network operating system software, downloadable from a global computer network, that delivers large amounts of computational power by utilizing idle computing resources in a network of individual computer work-stations." It appears that the district court mistakenly assumed that the similarity of the products' functions was the dispositive issue in the case; this misapprehension was magnified by the district court's error in confining its examination to the registration of the parties' products. Instead of a focus on the description of the goods in the trademark registry, the proper analytical framework, according to our cases, is "whether the parties' products are the kind the public might very well attribute to a single source." *AutoZone*, 543 F.3d at 931 (citations omitted); *McGraw-Edison Co.*, 787 F.2d at 1169. "The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer. Thus, a likelihood of confusion may exist even if the parties are not in direct competition, or their products and services are not identical." *AutoZone*, 543 F.3d at 931 (quotation and citation omitted).

This is a proposition we have repeatedly laid out in the many cases in which we've considered the likelihood of confusion between goods described by similar or identical marks. *See id.* at 931; *CAE,* 267 F.3d at 679; *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 463 (7th Cir. 2000); *McGraw-Edison Co.,* 787 F.2d at 1169. It was also recognized by the TTAB. "[I]t is not necessary that the goods and/or services be similar or competitive, or even that they move in the same channels of trade to support a holding of likelihood of confusion." *Phoenix Software Int'l,* Cancellation No. 92042881, at 9 (citing *Hilson Research Inc. v. Soc'y for Human Res. Mgmt.,* 27 U.S.P.Q. 2d 1423, 1432 (T.T.A.B. 1993)). "It is sufficient that the respective goods and/or services are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods and/or services are such that they would or could be encountered by the same persons under circumstances that could, because of the similarities of the marks used therewith, give rise to the mistaken belief that they originate from or are in some way associated with the same producer." *Hilson Research Inc.,* 27 U.S.P.Q. 2d at 1432.

Once we accept this proposition, we see that Wisconsin's focus on the descriptions in the registry, adopted by the district court, is a bit of a red herring. Our cases make clear that products don't even have to perform similar functions, much less be described identically, for a likelihood of confusion to exist. In *McGraw-Edison* we found that a likelihood of confusion could exist between a mark for electrical fuses and the mark on Disney's merchandise for the movie *Tron. McGraw-Edison Co.,* 787

F.2d at 1169. In *CAE*, we found that a likelihood of confusion could exist between a mark registered by a company that designed and manufactured sophisticated measuring equipment and a mark registered by a company that tested facilities for compliance with pollution laws. *CAE*, 267 F.3d at 679. In *AutoZone*, we found that a likelihood of confusion could exist between an auto-parts retailer's mark and the mark of a oil change and carwash operator. *AutoZone*, 543 F.3d at 931. All of these cases featured products with a far more tenuous similarity than that at issue here. We note that in these cases, the products had identical marks (with the exception of *AutoZone*, which featured two marks with identical "zone" suffixes). It is possible that we, as a circuit, have historically assigned too much weight to the fact that marks are identical. *Cf. M2 Software, Inc. v. M2 Commc'ns, Inc.* 450 F.3d 1378, 1385 (Fed. Cir. 2006). But, perhaps that is because the issue is fact-bound and identical marks often create triable issues of fact regarding the various ways a product is marketed. Regardless, neither party attacks our trademark standard as inconsistent with the Lanham Act. Furthermore, the identical nature of the marks weighed heavily in the TTAB's analysis. *Phoenix Software Int'l*, Cancellation No. 92042881, at 19 (citing *In re Shell Oil Co.*, 992 F.2d 1204 (Fed. Cir. 1993)). The TTAB also cited *Amcor, Inc. v. Amcor Indus., Inc.*, 210 U.S.P.Q. 70, 78 (T.T.A.B. 1981), for the proposition that when considering identical marks, "the relationship between the goods on which the parties use their marks need not be as great or as close as in the situation where the marks are not identical or strikingly similar."

The approach adopted by the district court limiting its consideration to the products as they are described is too formalistic and ignores the requirement that the products are to be examined as they appear to the consumer. "[O]ur inquiry in comparing the two products is not whether they are interchangeable, but whether the parties' products are the kind the *public* might very well attribute to a single source." *Eli Lilly & Co.*, 233 F.3d at 463 (emphasis added) (quotation omitted); *see also AutoZone*, 543 F.3d at 931; *McGraw-Edison*, 787 F.2d at 1169 ("In finding the parties' product lines to be 'entirely unrelated' the district court apparently ignored the question of whether the purchasing public might believe a single source could produce both [products].").

*Octocom Systems, Inc. v. Houston Computer Services, Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990), the Federal Circuit case that the district court relied on, is not to the contrary. In that case, the registrant whose mark was challenged tried to supplement the registration by showing that the registrant really intended its mark to cover a narrow class of goods, rather than the unlimited coverage that the actual mark sought. The Federal Circuit found that the subsequent attempt to limit the registration was improper and the court was required to consider only the goods as described in the registration. The court then found that there was a likelihood of confusion between the products because the registrant's original application "encompassed modems and computer programs" and thus conflicted with the petitioner's registration of a similar mark for computer programs. Furthermore, "the record supports no other factual findings but that

modems and computer programs are commonly used together in networking, could come from a single source, and be identified with the same mark. Thus, [the attempted registrant's] elimination of 'computer programs' from its application leaving only 'modems' was pointless maneuvering." *Octocom Sys.,* 918 F.2d at 943.

The likelihood of confusion in *Octocom* stemmed not from the fact that the registrations were identical, but from the registrations' coverage of similar products. In fact, in *Octocom*, the Federal Circuit recognized that the similarity of the products described in the registration may be "expressly or inherently" reflected. *Id.* at 942. The Federal Circuit noted that "[e]vidence that the goods of the applicant and opposer, as identified in the respective application and registration, are the types of goods that would be expected to move in different trade channels or be sold to different classes of purchasers may be material and relevant." *Id.* at 943. So, the relevant question for us is whether a product that runs on a mainframe and a product that runs on a network of computers are the types of goods that are similar enough to be attributed to a single source by consumers likely to use one of those products. While we must consider the marks as they are described, it would be a mistake to bar any evidence of their actual use as irrelevant. After all, one of the factors in the test is the "area and manner of concurrent use." *See AutoZone,* 543 F.3d at 929. And, as noted, the actual use of the product is relevant to explain the meaning of the terms used in the registration. *See Octocom Sys.,* 918 F.2d at 943; *see also CAE,* 267 F.3d at 681-82; *Forum Corp. of N. Am. v. Forum,*

*Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990). Indeed, the TTAB explicitly declared that it was considering the nature of the parties' goods "[t]o the extent that these facts provide some information about the market and purchasers of these goods." *Phoenix Software Int'l*, Cancellation No. 92042881, at 9.

Rejecting the district court's approach, however, does not dispose of the case. "Because confusion is a factual matter, the plaintiff must produce proof; a theory about how consumers *might* be confused will not do, unless evidence supports the theory." *Reed-Union Corp.*, 77 F.3d at 912. Even as we consider the products' actual uses to determine the meaning of the marks' registrations, or more specifically to determine whether there is a possibility of confusion between the two products as described in their registrations, Wisconsin would still prevail if there is no evidence to support the idea that a supplier of software to a mainframe system (the manner of use specified in Phoenix's registration) can be confused with a supplier of software to a network of individual computer workstations (the manner of use specified in Wisconsin's registration).

The TTAB relied on three key factors in its order to cancel Wisconsin's registration. First, and most importantly, it relied on the fact that the marks are identical. Wisconsin does not challenge this finding (and as noted, this seems to be a compelling factor in our circuit). Second, the TTAB found that the parties' software performs similar functions, which precluded a finding that they were used in unrelated fields. Third, it found that

"sophisticated purchasers would likely believe that there is some relationship or association between the sources of the goods under these circumstances." *Phoenix Software Int'l*, Cancellation No. 92042881, at 19. Ultimately, the TTAB concluded that sophisticated purchasers would associate the two products. Mapping the TTAB's findings onto our factors, we see that the TTAB's finding of a likelihood of confusion was based on the identical nature of the marks, the manner in which both parties' products are used, and the similarity of the products.

The district court dismissed these findings on the basis that all analysis of the products should have been confined to the terms in the registries. As we've explained, this was an error. Moreover, because the TTAB was using the correct factor-based balancing test, the district court was incorrect to dismiss the TTAB's findings on the area and manner of use factor by declaring that the TTAB had misallocated the burden of proof. Because the TTAB found that the similarity of the marks and products weighed in Phoenix's favor, the area and manner of use tipped the balance in favor of Phoenix. The TTAB noted specifically in its holding that "a presumption of validity attaches to a service mark registration, and the party seeking cancellation must rebut this presumption by a preponderance of evidence." *Id.* at 18. "We hold that petitioner has met its burden." *Id.* at 19.

Once we reinstate the TTAB's findings, we see that Phoenix has offered sufficient evidence to survive summary judgment on the issue of confusion. The TTAB

credited Phoenix's evidence that its mainframe soft-
ware can operate unaltered on a network of workstations.
The TTAB found that both programs perform similar
functions to the extent that Phoenix's representative
was himself confused by Wisconsin's public description
of its product; he thought it was Phoenix's own. The
TTAB further found that, as conceded by Wisconsin's
witness, there was "some incentive" to operate in both
the mainframe and network environments. The TTAB
also found that both products were delivered in the
same manner, and that the same customers are likely
to encounter both products, particularly since Wis-
consin indicated that it had been and would be
expanding its marketing efforts. For the TTAB, these
findings justified the cancellation of Wisconsin's mark.

Wisconsin does offer new evidence to rebut these
findings and argues that the facts should be interpreted
differently. Most significantly, Wisconsin argues that the
sophistication of consumers cuts in the state's favor. We
note that this factor was considered at length by the
TTAB, who found in Phoenix's favor. But as we dis-
cussed above, the question is not whether purchasers of
Phoenix's Condor product would accidentally buy Wis-
consin's product but whether those consumers would
likely attribute them to a single source. *In re Total Quality
Group Inc.*, 51 U.S.P.Q. 2d 1474, 1477 (T.T.A.B. 1999)
("[E]ven careful purchasers are not immune from source
confusion. We find this to be especially the case here
where the marks are substantially identical and the
goods are related."). Much of the evidence Wisconsin
offers is designed to show that mainframe purchasers

take care when choosing to purchase a product; this is relevant to, but not dispositive of the likelihood of confusion issue. 4 McCarthy on Trademarks and Unfair Competition § 23:103 ("When there is a strong likelihood of confusion created by other factors, even a high level of care exercised by a professional buyer may not be sufficient to tip the scales in the direction of no confusion.")

The TTAB credited Phoenix's sole shareholder, who testified that he was confused by Wisconsin's description of its product; we are bound to give this finding deference. This is a key piece of evidence supporting the finding. The TTAB's consideration of other factors, namely the fact that the marks are identical and that the products are similar (as determined by the TTAB) both reinforced the TTAB's judgment. There was also evidence admitted at the district court that the lines between mainframe operations and network systems are disappearing and that Wisconsin was broadening the scope of its operations. Wisconsin's evidence of sophistication, much of it considered by the TTAB, is not so compelling that we believe no issue of fact exists.

Wisconsin runs through the other factors, focusing mainly on the *DuPont* analysis, and makes good points. There was no actual confusion; the "downloadability" of both programs is not dispositive of whether the products were sold in similar trade channels; Phoenix may not have been diligent about protecting its mark; and any confusion is likely to be quickly rectified. Considering this evidence is appropriate, but none of this evidence

is sufficient to render the facts found by the TTAB immaterial and compel summary judgment. Weighing all of the parties' evidence is a task for a finder of fact and we are required to defer to the TTAB's determination on the issues it considered. Accordingly, we must reverse the district court and remand for a trial on the likelihood of confusion issue.

## IV. Phoenix's Counterclaims

Phoenix also asks us to reinstate the counterclaims it brought under 15 U.S.C. §§ 1114 and 1125 for infringement and false designation of origin; both sections announce Congress's intent to make states liable in a civil action to anyone damaged by the state's acts. But, Phoenix's counterclaims were dismissed on sovereign immunity grounds. We review the district court's grant of a motion to dismiss de novo. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).

The Eleventh Amendment bars suits against states and restores "the sovereign immunity that the States possessed before entering the Union." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669 (1999). There are two relevant exceptions to the sovereign immunity guarantee. *See id.* at 670. The first occurs when Congress acts pursuant to the Fourteenth Amendment to regulate state behavior. *Id.* (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976)). The second occurs when a state waives its sovereign immunity by consenting to suit. *Id.* (citing *Clark v. Barnard*, 108

U.S. 436 (1883)). Phoenix argues that its counterclaims should be reinstated under either theory.

## A. Was the Trademark Remedy Clarification Act a valid exercise of Congress's Fourteenth Amendment power?

The Trademark Remedy Clarification Act (TRCA), Pub. L. 102-542, 106 Stat. 3567, established state liability for trademark violations. A portion of the TRCA has already been deemed unconstitutional by the Supreme Court. *Coll. Sav. Bank*, 527 U.S. at 691. This portion provided for state liability for false advertising, which is one form a 15 U.S.C. § 1125(a) claim can take; the false designation of origin claim at issue here is another. We'll assume for purposes of our discussion that the claim we are considering is different from the provision at issue in *College Savings Bank*; in any event, the Supreme Court has not spoken clearly on the other counterclaim: trademark infringement under 15 U.S.C. § 1114.

The TRCA's sister statute, the Patent and Plant Variety Protection Remedy Clarification Act (Patent Remedy Act), established state liability for patent infringement and was similarly found unconstitutional. *See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 647-48 (1999). Phoenix's argument that it should be able to pursue a trademark infringement remedy against Wisconsin depends largely on its ability to convince us that its claims are different from patent enforcement and false advertising claims. The Supreme Court found that states were protected by the Eleventh

Amendment against claims for money damages under either of those causes of action. *Id.*; *Coll. Sav. Bank*, 527 U.S. at 691.

To preserve its claims against Wisconsin, Phoenix needs to show that Congress expressly intended to abrogate state sovereign immunity, that it did so under Section 5 of the Fourteenth Amendment, that the trademark in question was a property interest cognizable under the Fourteenth Amendment, and that the abrogation of state immunity was an appropriate exercise of Congress's Section 5 power. *See Fla. Prepaid*, 527 U.S. at 635. It is undisputed that Phoenix can clear the first two hurdles (Congress expressly intended to abrogate state sovereign immunity and it acted under Section 5). Wisconsin contends that the Fourteenth Amendment does not protect trademarks, but Supreme Court dictum indicates the opposite. "The Lanham Act may well contain provisions that protect constitutionally cognizable property interests—notably, its provisions dealing with infringement of trademarks, which are the 'property' of the owner because he can exclude others from using them." *Coll. Sav. Bank*, 527 U.S. at 673. Wisconsin gives us no reason to doubt that this would be the Court's current position.

So the question is whether the TRCA is an "appropriate" law as the term is used in Section 5 of the Fourteenth Amendment. ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."). In *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997), the Supreme Court held that Congress's Section 5 power is inherently limited to remedial and

preventive laws. When legislating under Section 5, Congress must achieve "a congruence between the means used and the ends to be achieved." *Id.* at 530. Furthermore, the law must be a proportional response to the problem Congress seeks to solve through legislation. *Id.* at 532; *see also Fla. Prepaid*, 527 U.S. at 639 (discussing *Boerne*). Thus, for Congress to invoke Section 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct.

As we've noted, the Supreme Court found that the Patent Remedy Act, which is to patents what the TRCA is to trademarks, was not a proportional or congruent exercise of Congress's Section 5 powers. That act was designed to remedy patent infringement by a state, just as the TRCA is designed to remedy trademark infringement, by providing for money damages against a state. In *Florida Prepaid*, the Supreme Court found that Congress identified little evidence of pervasive state infringement of patents. Instead, the harm Congress identified was speculative. *Id.* at 641. College Savings' alternative argument, joined by the United States, was that when a state infringes a patent without paying a fee, the state has denied the patent-holder of a property interest without due process of law. But, the Supreme Court rejected this argument because Congress "barely considered the availability of state remedies for patent infringement" and thus did not sufficiently consider whether existing state remedies might already provide constitutionally sufficient due process for patent infringement. *Id.* at 643. The Court also noted that states are not

liable for constitutional violations when they negligently cause injuries and that Congress made no distinction between negligent infringement (which would not be a proper subject of Congress's Section 5 power) and reckless and intentional infringement which would trigger the Fourteenth Amendment's protection. *Id.* at 645. For all these reasons, the Court found that the Patent Remedy Act did not abrogate a state's Eleventh Amendment immunity.

Wisconsin argues, and the district court found, that the same reasons support a decision to preserve state immunity against damages under the TRCA. We agree that the TRCA is not materially different from the Patent Remedy Act found unconstitutional in *Florida Prepaid*. Both acts, for instance, share the same Senate Report (S. Rep. No. 102-280) which identifies only one case of state trademark infringement where the state was protected from federal suit, and suffers from all the infirmities identified by the Supreme Court in *Florida Prepaid*, 527 U.S. at 643-45 (rejecting the idea that the legislative history of the Patent Remedy Act satisfies requirements for Congress's action under Section 5 of the Fourteenth Amendment).

As for whether trademarks are different than patents, Phoenix argues that trademarks are of permanent duration and that the creation of trademarks protects the public from confusion and thus they must be analyzed under a separate rubric than patents. We agree that the two rights are different, but the Supreme Court in *Florida Prepaid* treated patents as a serious property

right and its holding in that case did not turn on the nature of the property right, but on the insufficiently narrow tailoring of Congress's remedy to the harms it sought to remedy and the insufficient findings that a national remedy was necessary. Given the similarity between the laws here, we are compelled to find that *Florida Prepaid* controls the outcome of this issue. Unless Wisconsin waived its immunity from suit, it is protected from Phoenix's counterclaims.

## B. Did Wisconsin waive its immunity from suit?

One problem Congress identified when enacting the TRCA (and its sister patent statute) was the uneven playing field created by a trademark regime without remedies against states. In the patent context, it explained: "A public school such as UCLA can sue a private school for patent infringement, yet USC cannot sue UCLA for the same act. The status of an infringing party should have no relation to the amount of investment made in a product. State universities should not have an unjustified advantage in the commercial arena over private universities for funding because of the potential for immunity from patent infringement actions." S. Rep. No. 102-280, at 9 (1992) *reprinted in* 1992 U.S.C.C.A.N. 3568, 3094. The level-playing-field issue is particularly pertinent in the context of scientific research and patents, but this case exemplifies that similar concerns arise in the trademark arena.

Phoenix contends that we can fix this problem by finding that Wisconsin waived its sovereign immunity

by choosing to participate in the federally regulated trademark process. After all, Wisconsin could have chosen to use the CONDOR mark without registering it, and without concern for damages because of its sovereign immunity guarantee. Wisconsin, however, chose to register the mark, and actively participated in the system by which it gained benefits (i.e., clearing the field of other CONDOR marks). Wisconsin's gain of benefits from its participation in the system should, Phoenix argues, subject it to responsibilities arising from its participation—namely a suit for damages if it infringes on other marks in the system.

Unfortunately for Phoenix, the Supreme Court rejected a similar argument in the TRCA case, *College Savings Bank*, where it found that a state's decision to engage "in the interstate marketing and administration of its program," 527 U.S. at 671, is not a constructive waiver of immunity, *id.* at 687.

Wisconsin is in a bit of a different situation than was the state of Florida: it formally registered its mark with the PTO. It entered the federal trademark system not by simply possessing a trademark that it marketed in commerce, as Florida did, but by actively availing itself of the benefits of federal trademark registration. But *College Savings Bank* sweeps more broadly than merely rejecting a "market-entry" waiver of sovereign immunity. *College Savings Bank* rejected the entire notion of a constructive waiver of sovereign immunity, *id.* at 680, and limited the inquiry of waiver to whether "*the State* made an altogether voluntary decision to waive its im-

munity," *id.* at 681 (quotation omitted). A law that merely alerts the state to the federal government's intention to abrogate the state's immunity is insufficient to create a waiver if the state is engaging in otherwise lawful activity. *Id.* at 687. The state's choice to register its mark was otherwise lawful activity, and Phoenix does not and cannot suggest that the receipt of trademark registration is specifically conditioned on a waiver of immunity. In fact, Phoenix's counterclaims do not depend at all on whether Wisconsin registered its mark; the statutory infringement and false designation of origin claims are ordinarily available against any actor who infringes a registered mark.

After *College Savings Bank*, the doctrine of constructive waiver is no longer available. Wisconsin is entitled to assert its immunity from suit notwithstanding its voluntary participation in the federal trademark registration system.

But Wisconsin's participation in the trademark system is not the only conduct that Phoenix identifies as triggering a waiver of Wisconsin's Eleventh Amendment privileges. Phoenix also argues that Wisconsin waived its sovereign immunity the moment it invoked the jurisdiction of the district court pursuant to 15 U.S.C. § 1071(b). Phoenix cites *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 619 (2002), in support of this proposition. There, the state of Georgia was subject to state law claims against it in state court. It removed the case to federal court, and then argued that the Eleventh Amendment barred the federal court from

hearing the state law claims against it. In rejecting Georgia's immunity argument, the Supreme Court "focus[ed] on the litigation act" Georgia performed and concluded that removal was an insufficiently "special" act, *Lapides*, 535 U.S. at 620, to warrant departure from the long-standing general principle that "where a State *voluntarily* becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment." *Id.* at 619 (quoting *Gunter v. Atl. Coast Line R.R.*, 200 U.S. 273, 284 (1906)). It also necessarily implied that by removing the case to federal court, Georgia affirmatively changed the character of its participation in the litigation, for the Supreme Court recognized that Georgia had been "brought involuntarily into the case as a defendant in the original state court proceedings." *Id.* at 620.

Phoenix contends that Wisconsin's litigation status was similarly changed—and its sovereign immunity similarly waived—when it made the decision to file an action in district court pursuant to 15 U.S.C. § 1071(b) rather than appealing the TTAB's decision to the Federal Circuit pursuant to § 1071(a). In choosing to proceed under § 1071(b) rather than § 1071(a), Phoenix asserts, Wisconsin gained the benefit of additional evidence and so should face the cost of Phoenix's infringement and false designation of origin counterclaims.

But the simple cost-benefit analysis Phoenix proposes overlooks the true nature of the proceedings here. Wisconsin, like Georgia in *Lapides*, was originally haled into

litigation with Phoenix involuntarily. Its status was that of a defendant. *See* 37 C.F.R. § 2.116(b). Wisconsin's election to pursue an appeal in the district court rather than the appellate court—which it, like private parties to cancellation proceedings, was statutorily entitled to do—gave it the official title of plaintiff, but title is not what matters for sovereign immunity purposes. If the character of the litigation act turned on title, Georgia would have been able to assert its sovereign immunity claims in *Lapides*.

The technically voluntary nature of Wisconsin's appeal is not determinative either. Our dissenting colleague makes a thoughtful presentation on this front, but the mere fact that Wisconsin exercised its option to challenge an adverse decision against it does not necessarily result in a waiver of its sovereign immunity. Indeed, our colleague concedes that Wisconsin could have appealed in the Federal Circuit—another federal forum reached wholly voluntarily—and still retained its ability to mount a sovereign immunity defense to the very claims Phoenix brings here. *See* Dissent at 58.

What is crucial is the nature of Wisconsin's litigation act. Unlike Georgia's removal in *Lapides*, Wisconsin's pursuit of judicial review in the wake of the adverse agency decision it did not initiate is "special." Despite its formal characterization as a standalone civil action, *see* 15 U.S.C. § 1071(b); 37 C.F.R. § 2.145, at its heart Wisconsin's pursuit of redress in the district court is simply a continuation of Phoenix's original cancellation action. *Cf. Vas-Cath, Inc. v. Curators of the Univ. of Mo.*, 473

F.3d 1376, 1382 (Fed. Cir. 2007) (stating that an appeal brought in the district court pursuant to 35 U.S.C. § 146, which is roughly analogous to 15 U.S.C. § 1071(b), "is not a new claim, but an authorized phase of the interference proceeding that is conducted by the PTO and is subject to judicial review"). "[T]he mere seeking of judicial review of an agency decision . . . by a state that was a defendant before the agency [is] insufficient alone to infer a waiver of immunity," *Taylor v. U.S. Dep't of Labor*, 440 F.3d 1, 5 (1st Cir. 2004) (quotation omitted), and Phoenix has not identified for our consideration any other relevant affirmative litigation acts undertaken by Wisconsin.

We are mindful of the concerns about unfair litigation gameplay that animated the Court's holding in *Lapides*, 535 U.S. at 620-22; we recognize that while the Eleventh Amendment gives states an upper hand, it cannot be massaged to create unfair litigation advantages. Attempts to assert sovereign immunity under circumstances that create "inconsistency, anomaly, and unfairness" in the litigation context, *id.* at 620, implicate those concerns and cannot be permitted to go forward. But there is no indication that Wisconsin used— or even could use, for the potential exploitation of the sovereign immunity privilege is an imperative consideration as well, *see Lapides*, 535 U.S. at 621—its district court action as an opportunity to gain any sort of unfair or inconsistent litigation advantage over Phoenix here. *See Taylor*, 440 F.3d at 8 ("The *Lapides*-[*New Hampshire v.*] *Ramsey*[, 366 F.3d 1 (1st Cir. 2004)] line of cases does not prevent a litigant from obtaining any sort of

advantage relating to immunity in pursuing his case. They only condemn those litigation advantages that are 'inconsistent' or 'unfair.'" (quoting *Lapides*, 535 U.S. at 622)). To the contrary, Wisconsin did not employ the hybrid appellate vehicle to raise any new claims; it simply appealed the adverse TTAB ruling. Had it brought new claims against Phoenix, the nature of its litigation act, and the outcome of our analysis, would plainly be different; the assertion of previously unlitigated claims in a federal forum is undoubtedly "a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter . . . in a federal forum." *Lapides*, 535 U.S. at 624.

Wisconsin made a choice to proceed in the district court, and there were undeniably some litigation advantages to be had as a result of that decision. But these advantages are equally available to all participants in trademark cancellation proceedings; they simply cannot be considered "unfair" or "inconsistent." It would be both unfair and unrealistic to require states to passively accept—or even pre-empt, *see* Dissent at 61—adverse TTAB decisions so as to keep their sovereign immunity privilege intact. It was at Phoenix's behest that Wisconsin was "brought involuntarily into the case as a defendant," *Lapides*, 535 U.S. at 620, and Wisconsin's election to proceed in district court rather than before the Federal Circuit does nothing to fundamentally alter the nature of the proceedings or its participation in them.

Wisconsin's assertion of sovereign immunity in response to claims distinct from those raised in the

original administrative action does not implicate the fairness concerns identifed by the Supreme Court. Wisconsin immediately and unfalteringly asserted a sovereign immunity defense when the federal counterclaims were filed. *Contra Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1021-22 (9th Cir. 2010). It was generally entitled to defend against Phoenix's claims in such a manner, *see* Dissent at 58, and did not use any litigation sleight of hand to invoke the Eleventh Amendment, *see, e.g., Lapides*, 535 U.S. at 621; *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 373 (7th Cir. 2010) (en banc), *petition for cert. filed*, 79 U.S.L.W. 3063 (July 21, 2010) (No. 10-131); *New Hampshire v. Ramsey,* 366 F.3d 1, 16-17 (1st Cir. 2004). We therefore conclude that Wisconsin has not through its appeal from the TTAB's decision waived its sovereign immunity defense to Phoenix's counterclaims.

## V. Conclusion

The district court misapplied the likelihood of confusion test and improperly rejected the TTAB's factual findings. For that reason, Phoenix is entitled to a trial on the likelihood of confusion issue. However, Wisconsin is protected by the Eleventh Amendment from Phoenix's counterclaims. Accordingly, we reverse the district court's decision only with respect to its grant of summary judgment to Wisconsin on the likelihood of confusion issue and remand for a trial on that issue only.

WOOD, *Circuit Judge,* dissenting in part. Behind the details of the trademark dispute between appellant Phoenix International Software ("Phoenix") and the University of Wisconsin ("Wisconsin") is a difficult question of constitutional law: are Phoenix's compulsory counterclaims against Wisconsin barred by the sovereign immunity doctrine that the Supreme Court has found reflected in the Eleventh Amendment to the U.S. Constitution? My colleagues conclude that the answer to that question is yes, based primarily on their understanding of the decisions in *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* 527 U.S. 627 (1999) ("*Florida Prepaid*"), and *City of Boerne v. Flores,* 521 U.S. 507 (1997). With respect, I do not agree with them. I am willing to assume for the sake of argument that Wisconsin would have been entitled to assert sovereign immunity if Phoenix had sued it directly in federal court, although even that proposition is contestable given more recent developments in the law of sovereign immunity. But that is not how this case arose. Instead, it was Wisconsin that chose unrestricted litigation in the federal forum, when it decided to challenge the decision of the Trademark Trial and Appeal Board ("TTAB") in the federal district court instead of taking an appeal to the Federal Circuit. See 15 U.S.C. § 1071(b) (providing that a party "dissatisfied with the decision of the [TTAB]" may "have remedy by a civil action"). Having elected the district court, which was not limited to the record created in the administrative proceeding, it has effectively waived its sovereign immunity for all matters that might arise in that particular case, including

counterclaims that arise out of the same transaction or occurrence. See *Lapides v. Board of Regents of the University System of Georgia,* 535 U.S. 613 (2002). Thus, while I agree with the majority that the case must be remanded for a trial on the question whether there is a likelihood of confusion between Phoenix's CONDOR mark and Wisconsin's CONDOR mark, I would also reinstate Phoenix's counterclaims for damages based on trademark infringement and false designation of origin.


# I

Phoenix's right to pursue its counterclaims turns on whether Wisconsin waived its sovereign immunity when it decided to pursue a challenge to the decision of the TTAB in federal district court, rather than to take advantage of an appeal to the Federal Circuit. *Ante*, at 31-38. The majority concludes that we should not find waiver, but I do not agree with them. Even if the district court were the only forum available to the state—which it was not, as I explain later—nothing requires anyone to pursue an appeal from an administrative agency's ruling. To the contrary, sometimes Congress provides that no appeal is possible, and courts have regularly upheld such jurisdiction-stripping provisions. See, *e.g.*, *Kucana v. Holder*, 130 S. Ct. 827, 831 (2010) (reaffirming that the jurisdiction-stripping provision in 8 U.S.C. § 1252(a)(2)(b) prevents review of removal decisions of the Attorney General in the immigration area when those decisions are made discretionary by statute);

*Czerkies v. U.S. Dep't of Labor*, 73 F.3d 1435, 1437-39 (1996) (*en banc*) (recognizing that a federal court may not review a challenge to a benefits determination of the Office of Workers' Compensation Programs in the Department of Labor); *Marozsan v. United States*, 852 F.2d 1469, 1473 n.10 (7th Cir. 1988) (*en banc*) (discussing how veterans may not obtain federal-court review of an individual claims determination by the Veterans Administration). Wisconsin's choice here to contest the decision of the TTAB by filing an action in the federal district court is thus litigation conduct that is inconsistent with an assertion of sovereign immunity. This is especially the case because Wisconsin wants to enjoy the litigation advantages of the federal forum, in which it is seeking judicial action to overturn the TTAB's decision, while at the same time it is maneuvering to block Phoenix's effort to litigate claims in that court that arise out of the same transaction. (The majority suggests otherwise, see *ante*, at 36-37, but there is nothing in the record to support its assumption that Wisconsin has decided to forego the extra litigation advantages offered in the federal district court.) The waiver doctrines that the Supreme Court has endorsed do not permit this kind of selective litigation strategy, particularly given the fact that the trademark laws offered Wisconsin a different option—appeal to the Federal Circuit—that would have allowed it to challenge the agency's action based on the record created before the agency in a way that did not permit counterclaims.

A

The Supreme Court has interpreted the Eleventh Amendment to guarantee that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). The Court has long recognized, however, that a state waives its sovereign immunity when it consents to suit. *E.g.*, *Clark v. Barnard*, 108 U.S. 436 (1883). "Generally, we will find a waiver either if the State voluntarily invokes our jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to our jurisdiction." *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 675-76 (1999) ("*College Savings*") (internal quotation marks and citations omitted). The state's waiver must be "unequivocal [and] specifically applicable to federal-court jurisdiction." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985).

For more than a century, the Supreme Court has recognized that a state may voluntarily waive its immunity through conduct during litigation. In 1883, it held that when a state makes a "voluntary appearance" in federal court as an intervenor, that participation amounts to a wavier of the state's sovereign immunity. *Clark*, 108 U.S. at 447. To the same effect, it held in *Gunter v. Atlantic Coast Line R.R. Co.*, 200 U.S. 273, 284 (1906), that "where a state voluntarily become a party to a cause, and submits its rights for judicial determination, it will be bound thereby, and cannot escape the result of its own voluntary act by invoking the prohibitions of the 11th Amendment." Later, it wrote in *Gardner v. New Jersey*

that, in the context of a bankruptcy dispute, a state that voluntarily files in federal court "waives any immunity . . . respecting the adjudication of the claim." 329 U.S. 565, 574 (1947). Most recently, the Court confirmed in *Lapides* that its recognition of this principle remains unqualified: "The Court has long accepted this statement of the law as valid, often citing with approval the cases embodying that principle." 535 U.S. at 619 (citing *College Savings*, 527 U.S. at 681 n.3; *Employees Dep't of Pub. Health and Welfare of Mo. v. Department of Pub. Health and Welfare of Mo.*, 411 U.S. 279, 294 & n.10 (1973) (Marshall, J., concurring); *Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275, 276 (1959)).

*Lapides* confirms that the Court did not eliminate the notion of waiver by conduct in litigation when it issued its opinion in *Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459 (1945). *Ford* held that a state could assert its sovereign immunity for the first time in the Supreme Court, despite the state attorney general's defense on the merits in the lower courts. *Id.* at 467-69. For a time, it seemed that *Ford* was in tension with the view that voluntary invocation of federal jurisdiction waives any immunity defense. But the Court's decision in *Wisconsin Department of Corrections v. Schacht*, 524 U.S. 381 (1998), showed that this was not the case. There, the Court wrote that "[t]he Eleventh Amendment . . . does not automatically destroy original jurisdiction. Rather, the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can waive the defense. . . . Nor need a court raise the defect on its own. Unless the State raises the matter, a court can

ignore it." *Id.* at 389 (citations omitted). The year after *Schacht* was decided, the Court reaffirmed "the unremarkable proposition that a State waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal courts." *College Savings*, 527 U.S. at 681 n.3.

The question on which the Court granted review in *Lapides* was "whether a state waive[s] its Eleventh Amendment immunity by its affirmative litigation conduct when it removes a case to federal court . . . ." 535 U.S. at 617 (internal quotation marks omitted). Lapides, a professor employed by the Georgia state university system, had sued the Board of Regents in state court, in both their personal and official capacities. He asserted that they had violated both state law and his federal constitutional rights by placing allegations of sexual harassment in his personnel file. The state defendants removed the case to federal court, where they promptly sought dismissal of the official-action claims on state sovereign immunity grounds. Although the Court found it necessary to limit the strict reach of its ruling to state-law claims (noting that a state is not a "person" for purposes of 42 U.S.C. § 1983 and thus that the federal claims could not be sustained on that ground alone), its discussion of waiver by litigation conduct was a general one. The Court concluded that it would adhere to the rule in *Gunter*, quoted above, and stressed that a state cannot use the Eleventh Amendment as a get-out-of-court-free card when it voluntarily submits to a federal tribunal for a judicial determination of its rights. *Id.* at 619 (quoting *Gunter*, 200 U.S. at 284). It offered a number of reasons for its endorsement of waiver by litigation conduct:

> [A]n interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of "immunity" to achieve litigation advantages. . . . The relevant "clarity" here must focus on the litigation act the State takes that creates the waiver. And that act—removal—is clear.

*Id.* at 620. Central to the holding in *Ford*, the Court said, was the fact that it "involved a State that a private plaintiff had *involuntarily* made a defendant in federal court." *Id.* at 622. Concluding "that *Clark*, *Gunter*, and *Gardner* represent the sounder line of authority," the Court "[found] *Ford* inconsistent with the basic rationale of that line of cases" and "overrule[d] *Ford* insofar as it would otherwise apply." *Id.* at 623.

As I see it, the Court could not have expressed itself more plainly. *Ford* has been limited to its facts; states can waive their sovereign immunity by voluntary conduct in particular cases; and the potential sovereign immunity of a state does not implicate the federal court's subject-matter jurisdiction. The only question remaining is how to apply these broad principles to the case before us.

B

It is important, in considering that problem, to be precise about what aspect of Wisconsin's conduct we are talking about. One possibility is Wisconsin's decision to participate in the federal trademark system at all. The majority holds that this is not enough to support a conclusion of waiver, *ante*, at 31-33, and I agree with them. *College Savings*, which rejected the same argument in the patent context, rules out any possibility that Wisconsin constructively waived its immunity by registering its trademark. See 527 U.S. at 680-84. Nevertheless, the Court took care in *Lapides* to recall that "*College Savings Bank* distinguished the kind of constructive waivers repudiated there from waivers effected by litigation conduct." *Lapides*, 535 U.S. at 620.

Here, Wisconsin engaged in litigation conduct that must be evaluated. My colleagues believe that Wisconsin's actions in court were not enough to support a finding of waiver. They begin by comparing Wisconsin's conduct to that at issue in *Lapides*, highlighting the fact that in *Lapides* the state of Georgia was sued initially in a Georgia court under a state law that explicitly waived Georgia's immunity to damages in state court. *Id.* at 617. After that suit was filed, Georgia removed the action to federal court and asserted its sovereign immunity from suit. According to my colleagues, it was the use of the removal power in this context that demonstrated that Georgia had voluntarily invoked federal jurisdiction and waived its sovereign immunity. *Ante*, at 33-35.

The majority does not say whether it reads *Lapides* as limited to cases in which a state removes a particular type of state-law claim to federal court, but it suggests that litigation acts comparable in "nature" to removal may fall within the general rule of *Lapides*. See *ante*, at 35. Before moving forward, however, it is important to consider how broadly the Supreme Court's decision in *Lapides* ought to apply. In addition to a state-law claim based on a statute that waived Georgia's immunity in state court, the plaintiff in *Lapides* asserted a claim against Georgia under § 1983; the latter claim could not go forward against the state because a state is not a "person" for purposes of § 1983. *Lapides*, 535 U.S. at 617 (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989)). Accordingly, the Court was careful to say that its conclusion that the state's act of removing the case to federal court led to a waiver of its sovereign immunity was reached in "the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings." *Id.* at 617. At the same time, however, the Court offered a broader rationale for its ruling:

> It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the "Judicial power of the United States" extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the "Judicial power of the United States" extends to the case at hand. And a Constitution that permitted States to follow their litigation interests by freely asserting both claims

in the same case could generate seriously unfair results.

*Id.* at 619. The Court added that "[a] benign motive [for removing to federal court] . . . cannot make the critical difference for which Georgia hopes. Motives are difficult to evaluate, while jurisdictional rules should be clear. . . . To adopt the State's Eleventh Amendment position would permit States to achieve unfair tactical advantages, if not in this case, in others." *Id.* at 621 (internal citations omitted). We recently observed in our *en banc* decision in *United States v. Skoien* that "[t]his is the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings." 614 F.3d 638, 641 (7th Cir. 2010) (*en banc*). That message applies with equal force to the logic applied by the Court in *Lapides*.

Reflecting that spirit, most courts of appeals have applied the rule of *Lapides* to all instances of removal initiated by a state. The Fifth Circuit's decision in *Meyers ex rel. Benzing v. Texas* explains why this is the proper result:

> [I]n formulating its rationale, the Court did not restrict itself to facts, rules, or reasons peculiar to the *Lapides* case. Rather, throughout its opinion, the Court's reasoning, rule-making, and choice of precepts were derived from generally applicable principles serving "the judicial need to avoid inconsistency, anomaly, and unfairness" in states' claims of immunity in all types of federal litigation.

410 F.3d 236, 244 (5th Cir. 2005) (quoting *Lapides*, 535 U.S. at 620). While this court has had the opportunity to apply *Lapides* only in circumstances functionally equivalent to those at issue in *Lapides* itself, see *Omosegbon v. Wells*, 335 F.3d 668 (7th Cir. 2003) (considering a claim based on a state law waiving immunity that was removed to federal court by a defendant state), other courts have given *Lapides* a broader reading, see, *e.g.*, *Lombardo v. Pennsylvania Dep't of Public Welfare*, 540 F.3d 190, 198 (3d Cir. 2008) ("We hold that the [State]'s removal of federal-law claims to federal court effected a waiver of immunity from suit in federal court."); *Embury v. King*, 361 F.3d 562, 564 (9th Cir. 2004) (finding that *Lapides* applies to action removed by the state to federal court based on either state or federal law); *Estes v. Wyoming Dep't of Transp.*, 302 F.3d 1200, 1206 (10th Cir. 2002) (same). Only the Fourth Circuit has understood *Lapides* as limited to its facts. *Stewart v. North Carolina*, 393 F.3d 484, 488-90 (4th Cir. 2005). I agree with the Fifth Circuit's view that the Fourth Circuit's *Stewart* decision is an outlier that "misconstrues important principles animating *Lapides*." *Meyers*, 410 F.3d at 249.

As the *Lapides* Court explained, "In large part the rule governing voluntary invocations of federal jurisdiction has rested upon the problems of inconsistency and unfairness that a contrary rule of law would create." 535 U.S. at 622. "[R]emoval is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of the matter (here of state law) in a federal forum." *Id.* at 624. But it is, in the end, just a mechanism for

invoking the federal court's jurisdiction. There is no reason to think that the state's use of any other mechanism—such as filing an original action in federal court—carries less force, for waiver purposes.

The majority stresses that what was critical in *Lapides* was that "Georgia affirmatively changed the character of its participation in the litigation" by removing the case to federal court. *Ante*, at 34 (citing *Lapides*, 535 U.S. at 620). Indeed, the Supreme Court took care to point out that "the State was brought involuntarily into the case as a defendant" but then "voluntarily agreed to remove the case to federal court." *Lapides*, 535 U.S. at 620. I have no quarrel with my colleagues' view that a state waives its immunity only when it exhibits a voluntary change in behavior that demonstrates that it is no longer defending the lawsuit and is instead taking advantage of the federal forum. I also agree with them that "title is not what matters for sovereign immunity purposes." *Ante*, at 35. The waiver-by-litigation-conduct analysis should not turn on whether the state is a defendant, as in *Lapides*, an intervening claimant, as in *Clark*, 108 U.S. at 447, a plaintiff, as Wisconsin is here, or even an appellant in this court, see *Indiana Protection and Advocacy Services v. Indiana Family and Social Servicing Admin.*, 603 F.3d 365, 370 (7th Cir. 2010) (*en banc*). Instead, the crucial considerations are the voluntariness of the state's choice of forum and the functional consequences of that choice.

The Federal Circuit has had occasion to consider how the voluntary invocation principles in *Lapides* apply

outside of the removal context. Its conclusions can be summarized as follows. First, a state that initiates and prevails in a patent interference proceeding against a competing applicant cannot block an appeal to federal court of the agency's decision by asserting its sovereign immunity, because the statutory appeal is a later phase of one integrated proceeding. See *Vas-Cath, Inc. v. Curators of University of Missouri*, 473 F.3d 1376, 1385 (Fed. Cir. 2007) ("[T]he [state] University cannot both retain the fruits of [the administrative action] and bar the losing party from its statutory right of review[.]"). Second (and of particular interest here), a state that files suit in federal court to enforce a patent claim consents to all compulsory counterclaims that arise from the same transaction or occurrence. *Regents of the University of New Mexico v. Knight*, 321 F.3d 1111, 1125-26 (Fed. Cir. 2003). The Federal Circuit has refused, however, to find a waiver of state sovereign immunity when an initial proceeding brought by a state is dismissed for improper venue and the defendant in the initial proceeding later refiles elsewhere, see *Biomedical Patent Mgmt. v. California Dep't of Health Servs.*, 505 F.3d 1328, 1334-41 (Fed. Cir. 2007), or when a state that files suit in one district court faces related lawsuits in another district court, at least if the party that files suit in the other district court could have intervened in the initial action filed by the state, see *Tegic Communications Corp. v. University of Texas Board of Regents*, 458 F.3d 1335 (Fed. Cir. 2006). Lastly, the Federal Circuit has found no waiver when a state simply defends against a Lanham Act claim in federal court, see *State Contracting & Eng'g Corp. v. Florida*, 258 F.3d 1329, 1336 (Fed. Cir. 2001).

Phoenix's case presents an additional wrinkle that must be addressed: Wisconsin did not initiate the proceeding before the administrative agency, but it did choose to go to court after Phoenix prevailed in the TTAB. Several decisions of our sister circuits may help to unravel this last complication. In *New Hampshire v. Ramsey*, 366 F.3d 1, 16-17 (1st Cir. 2004), the First Circuit held that when a state voluntarily participates in proceedings before a federal arbitration panel without raising a sovereign immunity defense, the state cannot attempt to challenge the panel's decision in federal district court by claiming it was entitled to immunity from suit. The court reached this conclusion "even though [the state] was not formally the plaintiff in the administrative proceeding." *Id.* at 16. Any other decision, it reasoned, would allow the state to gain an unfair advantage. *Id.* at 16-17. Earlier, the same court had determined that the state's participation as a defendant in administrative proceedings did *not* waive a sovereign immunity defense in federal court when the state had "consistently asserted its sovereign immunity, both [in federal court] and in the administrative proceeding." *Rhode Island Dep't of Envt'l Mgmt. v. United States*, 304 F.3d 31, 49 (1st Cir. 2002). My colleagues rely on the First Circuit's most recent decision involving state sovereign immunity and administrative proceedings, *Taylor v. U.S. Department of Labor*, 440 F.3d 1 (1st Cir. 2005). That case involved a situation "slightly different" from the First Circuit's earlier decisions, *id.* at 5, and its unique circumstances provide little help in evaluating Wisconsin's litigation conduct here. The state in *Taylor*

requested adjudicative proceedings before an ALJ for the very purpose of asserting its sovereign immunity from suit. *Id.* at 7-8. The state's request for an ALJ was necessary because the sovereign immunity defense "was not available at the investigatory stage of the administrative proceedings." *Id.* at 8.

The distinction that these courts have recognized, between a voluntary, active decision by the state to entrust a matter to federal court and involuntary, defensive measures, is reflected in the Supreme Court decisions I have discussed above. When a state chooses to intervene in a federal case, it waives its immunity for purposes of those proceedings. *Clark*, 108 U.S. at 447-48. If a state voluntarily files a claim in federal court, waiver once again occurs. *Gardner*, 329 U.S. at 574. Moreover, a waiver of immunity in an initial proceeding extends to all ancillary proceedings that follow. *Gunter*, 200 U.S. at 281-82, 289-90. I conclude, both from the Supreme Court's many decisions in this area and from the decisions in our sister circuits, that *Lapides* requires a finding of waiver in the present case. Wisconsin's decision to challenge the TTAB's unfavorable decision by initiating a suit in federal court is precisely the affirmative choice to move to federal district court that my colleagues say that *Lapides* requires. A state's decision to initiate an action in federal court challenging an agency decision should bar a finding of sovereign immunity as a defense to counterclaims arising out of the same transaction or occurrence that the defendant wishes to raise. (Sovereign immunity to one side, those counterclaims are regarded as compulsory by Federal Rule of Civil Procedure 13(a).)

C

Wisconsin has raised, or could raise, a number of objections to my position, but none of them withstands close examination. First, it may complain that it was forced to bring this lawsuit in the district court once the TTAB ruled adversely to it. My colleagues describe Wisconsin's decision as "technically voluntary," *ante*, at 35, but they regard it as practically forced. I do not see it that way, for the simple reason that Wisconsin was not compelled to do anything. Just as Georgia in *Lapides* had the option of litigating in its home court rather than removing to federal court, Wisconsin here enjoyed a number of options, and each option carried a different implication for sovereign immunity. It is useful, in this connection, to recall how the present lawsuit came about. Phoenix filed a petition with the TTAB seeking to cancel Wisconsin's CONDOR mark, see 15 U.S.C. § 1064, arguing that the University's mark would be confused with Phoenix's own CONDOR mark, see 15 U.S.C. § 1052(d). The TTAB agreed with Phoenix and cancelled Wisconsin's mark. *Phoenix Software Int'l v. Board of Regents of the Univ. of Wis. Sys.*, Cancellation No. 92042881 (T.T.A.B. Sept. 26, 2007), app. at 46. At that point, Wisconsin had three choices: (1) it could do nothing and let the TTAB decision stand; (2) it could appeal the TTAB decision to the Federal Circuit, 15 U.S.C. § 1071(a); or (3) it could forego an appeal and initiate a civil action challenging the cancellation in federal district court, 15 U.S.C. § 1071(b). As we know, Wisconsin chose the third of these paths. It is helpful to begin by comparing choice #3 to the other two.

1. *Do Nothing.* First, Wisconsin could have acquiesced in the TTAB's cancellation of its mark and found a new trademark for its software. Nothing forced it to spend a minute in federal court. The state may object that it is unfair to force it to choose between maintaining its immunity and challenging an adverse agency decision, but that is no more unfair than the present law, which permits the state to enjoy the benefits of the trademark system while exempting itself from certain forms of accountability to others who use the same system. Although *College Savings* forecloses a theory of constructive waiver based solely on the fact of the state's participation in the trademark system, there is no reason to expand this principle to its outer limits. (Indeed, as I will explain shortly, the evolution of the sovereign immunity doctrine illustrates that there is every reason to be cautious about expansions when we are dealing with commercial activities.) Administrative agencies resolve the rights of parties before them every day, and Congress does not always see fit to provide for recourse to the courts. Indeed, I am not familiar with any administrative scheme in which the party who loses before the agency is *compelled* to appeal the adverse decision.

An appeal or a new lawsuit is a privilege that is often extended, but that privilege sometimes comes at a certain price. Perhaps, as here, the new lawsuit in district court will offer *de novo* review on an expanded record—something the agency winner (in this case, Phoenix) will dislike, but the loser (Wisconsin) will appreciate. Supplemental claims and counterclaims might be added once the case reaches the court. See, *e.g., City of*

*Chicago v. International Coll. of Surgeons*, 522 U.S. 156 (1997). Only if a challenge to the TTAB decision in federal district court is a necessary facet of any party's participation in the trademark system would *College Savings* dictate the conclusion that the state's invocation of federal jurisdiction is involuntary and thus does not support a finding of waiver of sovereign immunity. If, as I believe, a district court action is optional, then the decision to enter federal court is properly understood as a voluntary invocation of federal jurisdiction and a waiver of sovereign immunity.

Another way to ask the question whether the state's appeal of a decision to the district court is a voluntary move to a new tribunal is to ask whether requiring the state to accept the TTAB's decision without further recourse would be offensive somehow. Not that I can see. Other regimes that pass constitutional muster where federal court review of agency adjudication is curtailed concern rights at least as precious as a party's interest in a trademark. Just this past Term, the Court reaffirmed that judicial review of the Attorney General's immigration removal determinations may be limited, see *Kucana*, 130 S. Ct. at 831, and we have recognized in at least two *en banc* decisions that review of an agency's entitlement determinations may be foreclosed, see *Czerkies*, 73 F.3d 1437-39; *Marozsan*, 852 F.3d at 1473 n.10. In many circumstances, Congress has seen fit to limit the role of federal courts in disputes about important rights and courts do not regard the limitation as impermissible or offensive. See, *e.g.*, the jurisdiction-limiting provisions in the Prison Litigation Reform Act of 1996, Pub. L. No.

104-134, 110 Stat. 1321-66, and the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214. If there is nothing wrong with foreclosing review of the TTAB's decision altogether, then there is nothing unfair about compelling a state to choose between its sovereign immunity and a second bite at the apple after the agency has spoken.

The Federal Circuit has considered and rejected an argument quite similar to the one Wisconsin is making here. In *Vas-Cath, Inc.*, which I have already mentioned, the Federal Circuit rejected a state's attempt to avoid on sovereign immunity grounds an appeal of a Patent and Trademark Office ("PTO") priority determination. 473 F.3d at 1383-84. The court held that the state's participation in the agency proceedings waived its immunity claim in federal court. The state had argued "that it had no choice but to request the [patent] interference and participate in an adversarial proceeding, for if it had not taken this action it would have lost its rightful patent . . . ." *Id.* at 1384. The court responded as follows:

> [T]he question in this case is not whether the University voluntarily participated in the PTO interference, but whether the University can now bar the appeal of the PTO's decision in favor of the University. This argument raises issues not of federalism, but of litigation tactics . . . .

*Id.* at 1384. While our case concerns trademarks rather than patents, the underlying issue is the same. Wisconsin should not be permitted to wait and see whether it is

successful in the agency, and then challenge the agency's decision with a stacked deck, protected by sovereign immunity from counterclaims filed by its adversary.

2. *Appeal to the Federal Circuit.* While the majority expresses little concern about unfair litigation tactics on the state's part, I see matters differently. Wisconsin's sovereign immunity claim loses any remaining force when one realizes that the state freely chose to challenge the TTAB decision in the federal district court rather than the Federal Circuit. Had the University of Wisconsin opted instead for the Federal Circuit, Phoenix would not have been able to introduce counterclaims into the litigation. (Like all of the federal courts of appeals, the Federal Circuit operates under the Federal Rules of Appellate Procedure, not the Federal Rules of Civil Procedure, and there is no provision in the Appellate Rules that would allow an appellee to introduce a new counterclaim.) The Federal Circuit was thus an available forum that would have been able to focus exclusively on the TTAB's decision, without any threat to Wisconsin's sovereign immunity. Finally, had Phoenix responded to an appeal to the Federal Circuit with an original action against Wisconsin in district court, the state would naturally have been fully entitled to assert its sovereign immunity. The majority recognizes that this is the case. See *ante*, at 35. The question the majority brushes over is why Wisconsin chose to attack the agency decision in the district court rather than the Federal Circuit, given that the latter forum provided the state all the relief it sought with complete insulation from Phoenix's counterclaims.

An animating principle of *Lapides* is that a state should not reap litigation advantages through its selection of a forum and subsequent assertion of sovereign immunity as a defense. By choosing to institute a new action in the federal district court, Wisconsin provided itself better odds of reversing the agency's cancellation of its mark. As I have already noted, the standard of review when a TTAB decision is examined by the district court is *de novo*, and in the district court the state is allowed to present new evidence that was not part of the agency record. In comparison, review in the Federal Circuit follows typical rules of administrative law, with deference to the agency's factual and legal conclusions and limitation to the record that has already been compiled. Along with the advantages to the state of filing an action in the district court came the possibility that the defending party (Phoenix) would assert counterclaims in that forum—counterclaims that it risked losing if it failed to raise them. See FED. R. CIV. P. 13(a). Nothing in *Lapides* supports the conclusion that Wisconsin could take advantage of the benefits of the federal district court while avoiding aspects of that forum that it found less desirable.

As my colleagues note, the Court in *Lapides* remarked that there was nothing "special" about removal that warranted abandoning the general legal principle that a state may waive its immunity through its litigation conduct. 535 U.S. at 620. Addressing this point, the majority maintains that Wisconsin's decision to file suit in the district court here was "special" (unlike the state's decision in *Lapides*) and thus the general waiver

principles do not apply and Wisconsin's immunity is left intact. See *ante*, at 34-36. They explain that they see Wisconsin's lawsuit as "special" because it is merely an appeal of an agency decision—a continuation of a proceeding in which Wisconsin was the defendant. Perhaps this would be a different case if that were the only option available to the state. But as I have already explained, it was not. Furthermore, to hang the entire sovereign immunity analysis on the question whether a particular litigation act is "special" is to adopt a rule that will be nearly impossible to apply. All the *Lapides* Court said was that removal is *not* "special"—it did not provide any guidance about what litigation conduct it might in the future consider "special" enough to avoid waiver. See 535 U.S. at 620. The majority here has not supplied the necessary guidance in this respect—because, I believe, the task is impossible—for either states or the parties with whom states litigate. For example, why is filing a lawsuit challenging an agency decision in the district court more "special" than intervening to protect an interest that is at stake in ongoing litigation in the district court?

Putting to one side the options Wisconsin chose not to pursue, it is also worth noting that the system for which Wisconsin is arguing creates serious inefficiencies for the trademark system. It wants the district court to reverse the agency decision but to stop before it reaches the other litigant's competing trademark claim. In effect, it seeks an unnatural bifurcation of a single, integrated problem: Who owns the mark CONDOR? How much does that mark cover? And what payments might be

due if one party has encroached upon the other's space? The only efficient way—perhaps even the only possible way—to resolve these questions is in one proceeding, before one tribunal.

Finally, Wisconsin ignores the fact that at one point in the history of this case it had yet another avenue available to it. Before Phoenix initiated TTAB proceedings, Wisconsin could have filed a suit against Phoenix in state court to resolve who had rights to the CONDOR mark. Although the federal courts have jurisdiction over trademark claims brought under the Lanham Act, that jurisdiction is not exclusive. See 28 U.S.C. § 1338(a); 15 U.S.C. § 1121; *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005); *Aquatherm Industries, Inc. v. Florida Power & Light Co.*, 84 F.3d 1388, 1394 (11th Cir. 1996). (Note, in contrast, that federal jurisdiction is exclusive in patent and copyright cases. See 28 U.S.C. § 1338(a) ("Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.").) A party alleging a trademark violation under the statute may litigate in state court if it so chooses. Accordingly, if Wisconsin was concerned about Phoenix's competing CONDOR trademark and wished to preserve its sovereign immunity, it had the option of filing its own infringement action in Wisconsin state court at the outset.

D

In summary, as I see it, Wisconsin's effort to block Phoenix's compulsory counterclaims in federal court

while seeking relief from that court in the very same lawsuit implicates the very same fairness concerns that the Supreme Court identified in *Lapides.* Wisconsin was not forced to litigate in the federal district court. Its choice to do so was every bit as free as that of the University of Georgia in *Lapides* to remove its case from state court to federal court. Neither *Lapides* nor any other decision of the Supreme Court supports the idea that waiver of immunity through litigation conduct occurs only when a state files suit asserting new claims against a defendant. See *ante*, at 37 (discussing how the outcome would be different if Wisconsin "[h]ad . . . brought new claims against Phoenix" in the district court). Nor does that line of cases hold that a state must defend a claim on the merits, participate in discovery, and file a motion to dismiss and a motion for summary judgment in order to waive immunity. See *ante*, at 38 (referring to the Ninth Circuit's recent decision in *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1021-22 (9th Cir. 2010)). I would find that the University of Wisconsin waived its sovereign immunity for purposes of claims associated with the CONDOR trademark when it filed suit in the district court. Phoenix was thus entitled to assert its compulsory counterclaims, which by definition had to arise out of the same transaction or occurrence. As the Supreme Court acknowledged:

> It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the "Judicial power of the United States" extends to the case at hand, and

(2) to claim Eleventh Amendment immunity, thereby denying that the "Judicial power of the United States" extends to the case at hand. And a Constitution that permitted States to follow their litigation interests by freely asserting both claims in the same case could generate seriously unfair results.

*Lapides*, 535 U.S. at 619. I would reinstate Phoenix's counterclaims and remand for further appropriate proceedings.

## II

Broader policy considerations surrounding the doctrine of sovereign immunity also argue strongly for finding a waiver in these circumstances, which involve ordinary commercial activity being conducted by the state. Although the Supreme Court has touched on this aspect of sovereign immunity law in the past, a closer look at its decisions reveals that there are still unresolved questions that would benefit from a closer look. And at a minimum, these issues inform the question of how broadly or narrowly we should construe the waiver doctrines I have just been considering.

From the time of the Declaration of Independence until the Constitution of 1787 took effect, the states were fully sovereign in the international sense of the term: they were States, just as modern-day France, Japan, or India are States today. This fact is reflected in Articles II and III of the Articles of Confederation. Article II affirms that "[e]ach State retains its sovereignty, free-

dom and independence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled." ARTICLES OF CONFEDERATION of 1781, art. II. Article III reinforces the point by specifying, "The said States hereby *severally* enter into *a firm league of friendship with each other*," for purposes including common defense and general welfare. *Id.* art. III (emphasis added). It was against this backdrop that the 1787 Constitution was written. Although that Constitution greatly strengthened the powers of the central, or "federal," government, it did not change the fundamental principle under which the states remain sovereign entities to the extent that the Constitution does not override their sovereignty. Indeed, that is precisely the point of the Tenth Amendment, which says, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. This assurance, no less than the remainder of the Bill of Rights, was regarded as essential during the ratification debates.

A

Over the years, the Supreme Court has consistently recognized the sovereign immunity of the states. Even in *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419 (1793), better known for its holding that the state of Georgia could be sued than for the reasons offered by Justices Blair and Wilson (over Justice Iredell's dissent), all members of the Court understood that they had to decide

whether the state's sovereignty had been overridden by the federal Constitution. Justice Blair thought that Article III of the Constitution provided a clear answer in the affirmative to that question; he pointedly noted that he "thought it best to pass over all the strictures which have been made on the various European confederations; . . . . The Constitution of the United States is the only fountain from which I shall draw; the only authority to which I shall appeal." 2 U.S. at 450. Justice Wilson allowed his gaze to cover more ground; he chose to look at the principles of general jurisprudence, the laws and practices of other States and Kingdoms, and finally the constitutional text. After a philosophical discussion on the concept of sovereignty, he concluded that precedents existed under which states could be brought to account before tribunals and that the Constitution permitted this suit. *Id.* at 453-66.

Justice Iredell, whose view was quickly vindicated by the passage of the Eleventh Amendment, would have found immunity for Georgia. *Id.* at 449-50. He emphasized the lack of federal legislation that would have permitted the lawsuit before the Court, but he added these words: "So much, however, has been said on the Constitution, that it may not be improper to intimate that my present opinion is strongly against any construction of it, which will admit, under any circumstances, a compulsive suit against a State for the recovery of money." *Id.* at 449. Justice Iredell took this absolute position because, as he had noted earlier, "in every State in the Union, previous to the adoption of the Constitution, the only common law principles in regard to suits

that were in any manner admissible in respect to claims against the State, were those which in England apply to claims against the crown . . . ." *Id.* at 437. He drew a direct link between the states' immunity from suit before the adoption of the Constitution—immunity derived from principles of sovereign immunity embodied in public international law—and the states' continuing immunity afterwards:

> [I]t is incumbent upon us to enquire, whether previous to the adoption of the Constitution (which period, or the period of passing the law, in respect to the object of this enquiry, is perfectly equal) an action of the nature like this before the Court could have been maintained against one of the States in the Union upon the principles of the common law, which I have shown to be alone applicable. If it could, I think it is now maintainable here; If it could not, I think, as the law stands at present, it is not maintainable; whatever opinion may be entertained; upon the construction of the Constitution, as to the power of Congress to authorize such a one.

*Id.*

Throughout the nineteenth century, the Court commonly turned to the same principles of public international law that it was using for foreign relations when it had to decide issues involving interstate relations. Thus, for example, in *Bank of the United States v. Donnally*, 33 U.S. 361 (1834), the Court had to decide whether a promissory note in the Bank's favor that was signed

in Kentucky could be enforced in Virginia, over an assertion that the statute of limitations in Virginia had run. In the course of upholding Virginia's right to apply its own limitations period (and thus defeat the Bank's action), Justice Story wrote that "whatever may be the legislation of a state, as to the obligation or remedy on contracts, its acts can have no binding authority beyond its own territorial jurisdiction. Whatever authority they have in other states, depends upon principles of international comity, and a sense of justice." *Id.* at 372. More than forty years later, Justice Field used almost the same words in *Pennoyer v. Neff,* 95 U.S. 714 (1877), the decision (now overruled) that for years was the wellspring of the constitutional law of personal jurisdiction. There he wrote that "[t]he several States of the Union are not, it is true, in every respect independent, many of the right and powers which originally belonged to them being now vested in the government created by the Constitution. But, except as restrained and limited by that instrument, they possess and exercise the authority of independent States, and the principles of public law to which we have referred are applicable to them." *Id.* at 722. He continued with the observation that "[t]he several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others." *Id.*

The Supreme Court has returned repeatedly to this theme in the line of cases that began with *Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (1996), in which the Court reinvigorated the doctrine of state sovereign immunity:

Although the text of the [Eleventh] Amendment
would appear to restrict only the Article III diver-
sity jurisdiction of the federal courts, we have
understood the Eleventh Amendment to stand
not so much for what it says, but for the presup-
position . . . which it confirms. . . . That presup-
position, first observed over a century ago in
*Hans v. Louisiana*, 134 U.S. 1 (1890), has two parts:
first, that each State is a sovereign entity in our
federal system; and second, that "'[i]t is inherent
in the nature of sovereignty not to be amenable
to the suit of an individual without its consent,'"
*id.*, at 13 (emphasis deleted), quoting The Fed-
eralist No. 81, p. 487 (C. Rossiter ed. 1961) (A.
Hamilton). . . . For over a century we have reaf-
firmed that federal jurisdiction over suits against
unconsenting States was not contemplated by
the Constitution when establishing the judicial
power of the United States.

517 U.S. at 54 (some internal quotation marks and cita-
tions deleted). The theme continues in *Florida Prepaid*,
527 U.S. at 634-35, *College Savings*, 527 U.S. at 669-
70 (referring to "the sovereign immunity that the
States possessed before entering the Union"), *Alden
v. Maine*, 527 U.S. 706, 713 (1999) ("[A]s the Constitu-
tion's structure, its history, and the authoritative inter-
pretations by this Court make clear, the States' immunity
from suit is a fundamental aspect of the sovereignty
which the States enjoyed before the ratification of the
Constitution, and which they retain today (either
literally or by virtue of their admission into the Union

upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments."), *Kimel v. Florida Board of Regents,* 528 U.S. 62, 72-73 (2000), *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 363-64 (2001), and *Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743, 760 (2002) ("The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities.").

B

This brief review demonstrates that the states enjoy "sovereign immunity." But that turns out to be just the beginning of the inquiry. The term is, after all, a general one; it applies not only to the states, but to the United States, to foreign countries, and to Native American tribes. Early theorists thought that sovereignty was necessarily a singular phenomenon: either an entity enjoyed sovereignty, or it did not—there was no such thing as partial sovereignty. See, *e.g.*, J.L. BRIERLY, THE LAW OF NATIONS: AN INTRODUCTION TO THE INTERNATIONAL LAW OF PEACE 8 (Sir Humphrey Waldock ed., 6th ed. 1963). A sovereign state is recognizable through several characteristics: a specific territory, a permanent population, its own government in control, and the capacity to engage in formal relations with other such entities. RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 201 (1987). The Framers of the Constitu-

tion, however, had a more nuanced view of the concept of sovereignty. As Justice Kennedy put it in his concurring opinion in *U.S. Term Limits, Inc. v. Thornton*, the Framers "split the atom of sovereignty" between the states and the national government. 514 U.S. 779, 838 (1995) (Kennedy, J., concurring). Thus, with reference to state or Native American sovereignty, it is always necessary to consider whether sovereign powers have already been ceded, see, *e.g., Central Virginia Community College v. Katz*, 546 U.S. 356, 377-78 (2006) (states agreed in the plan of the constitutional Convention not to assert sovereign immunity in bankruptcy proceedings), or abrogated by valid congressional legislation, see, *e.g., Seminole Tribe*, 517 U.S. at 55-73; see also *City of Boerne*, 521 U.S. at 529-30 (describing requirements for valid remedial measures under section 5 of the Fourteenth Amendment). In addition, as the Supreme Court made clear in *Wisconsin Department of Corrections v. Schacht*, another attribute of sovereign immunity under the federal Constitution is that "the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can waive the defense. . . . Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it." 524 U.S. 381, 389 (1998) (citations omitted).

Another question, largely unexplored for state sovereign immunity, but by now well elaborated for foreign sovereign immunity, deals with the scope of the defense. Is the doctrine absolute, or is it qualified or restrictive? And if it has changed over time, are courts

required to apply the doctrine as it applied at the time of the Founding, or at the time any given state entered the Union, or as the doctrine is generally understood today?

The answer to these latter questions for purposes of foreign sovereign immunity has received extensive attention in both Congress and the courts. From the Founding until 1952, the United States granted foreign nations absolute immunity from suit in U.S. courts as a matter of comity. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486-89 (1983) (discussing *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812)). The Supreme Court "deferred to the decisions of the political branches . . . on whether to take jurisdiction over actions against foreign sovereigns" and, "[u]ntil 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns." *Id.* at 486. Reacting in the wake of World War II to the important role of state-owned enterprises in the Communist countries and reluctant to give a litigation advantage in U.S. courts to those enterprises, in 1952 the United States shifted its position. Commentators regularly outlined the tension between absolute sovereign immunity and the rise of state trading, particularly in the Soviet Union, and expressed the concern that "private traders will be reluctant to deal with state traders if their legal rights and remedies are greatly curtailed by the principle of sovereign immunity." Bernard Fensterwald, Jr., *Sovereign Immunity and Soviet State Trading*, 63 Harv. L. Rev. 614, 614 (1950); see also Sigmund Timberg, *Sover-*

*eign Immunity, State Trading, Socialism and Self-Deception*, 56 NW. U. L. REV. 109, 111 (1961).

In 1952, Jack Tate, Acting Legal Adviser for the Department of State, wrote a letter to the Acting Attorney General announcing that the State Department intended henceforth to apply a restrictive theory of foreign sovereign immunity:

> According to the classical or absolute theory of sovereign immunity, a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign. According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*).

Letter from Jack B. Tate, Acting Legal Adviser, U.S. Department of State, to Acting U.S. Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dep't State Bull. 984-85 (1952). After describing the trend among various countries toward a restrictive theory of sovereign immunity and noting "that the widespread and increasing practice on the part of governments of engaging in commercial activities [made] necessary a practice which [would] enable persons doing business with them to have their rights determined in the courts," Tate wrote that it would thereafter be the State Department's policy "to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immu-

nity." *Id.* "The reasons which obviously motivate state trading countries in adhering to the theory [of absolute immunity] with perhaps increasing rigidity," wrote Tate, "are most persuasive that the United States should change its policy." *Id.*

Experience under the Tate Letter demonstrated that more was necessary, as the Supreme Court recounted in *Verlinden*:

> The restrictive theory was not initially enacted into law . . . and its application proved troublesome. As in the past, initial responsibility for deciding questions of sovereign immunity fell primarily upon the Executive . . . and the courts abided by "suggestions of immunity" . . . . As a consequence, foreign nations often placed diplomatic pressure on the State Department in seeking immunity. On occasion, political considerations led to suggestions of immunity in cases where immunity would not have been available under the restrictive theory.

> An additional complication was posed by the fact that foreign nations did not always make requests to the State Department. In such cases, the responsibility fell to the courts to determine whether sovereign immunity existed, generally by reference to prior State Department decisions. . . . Not surprisingly, the governing standards were neither clear nor uniformly applied.

> In 1976, Congress passed the Foreign Sovereign Immunities Act in order to free the Government

> from the case-by-case diplomatic pressures, to clarify the governing standards, and to "assur[e] litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process," H.R. Rep. No. 94-1487, p. 7 (1976).

*Verlinden B.V.*, 461 U.S. at 487-88 (citations and footnote omitted).

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), and 1602-1611, codifies the restrictive theory of sovereign immunity. It provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," 28 U.S.C. § 1604, except in cases where:

- the foreign state has explicitly or impliedly waived its immunity, § 1605(a)(1);

- the action is based on commercial activity carried on in the United States by the foreign state, an act performed in the United States related to commercial activity of the foreign state elsewhere, or an act outside of the United States related to commercial activity of the foreign state outside of the United States that causes a direct effect in the United States, § 1605(a)(2);

- the action concerns rights in property that has been taken in violation of international law, where the property is connected to commercial activity of the foreign state within the United States, § 1605(a)(3);

- the action concerns rights in real estate or inheritance or gift property located in the United States, § 1605(a)(4);

- the action involves certain noncommercial torts occurring within the United States, § 1605(a)(5);

- the action involves a maritime lien, § 1605(b); or

- the action involves certain acts of terrorism connected to the foreign state, § 1605A.

In addition, in actions brought by foreign States (or in cases where a foreign State intervenes) the foreign State is not accorded immunity with respect to any counter-claim:

(a) for which a foreign state would not be entitled to immunity under section 1605 or 1605A . . . had such claim been brought in a separate action against the foreign state; or

(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or

(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

28 U.S.C. § 1607.

"The most significant of the FSIA's exceptions . . . is the 'commercial' exception of § 1605(a)(2) . . . ." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992). When

evaluating whether a foreign State has engaged in commercial activity that falls within the commercial activity exception, a court must evaluate the nature of the act, rather than the purpose for which that act was undertaken. 28 U.S.C. § 1603(d); *Republic of Argentina*, 504 U.S. at 614 ("[T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade or traffic or commerce,' Black's Law Dictionary 270 (6th ed. 1990)."). "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina*, 504 U.S. at 614. Where one of the FSIA's statutory exceptions, like the one for commercial acts, applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances" (with modifications for punitive damages and wrongful death actions). 28 U.S.C. § 1606.

The Supreme Court has had several opportunities to discuss the commercial-act exception to the general rule of foreign sovereign immunity. It has recognized that "the distinction between state sovereign acts, on the one hand, and state commercial and private acts, on the other, [is] not entirely novel to American law." *Republic of Argentina*, 504 U.S. at 613 (discussing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695-96 (1976)). Indeed, as early as 1823 Chief Justice Marshall noted the importance of the distinction:

It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted.

*Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. (9 Wheat.) 904, 907 (1823); *cf. Sloan Shipyards Corp. v. United States Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549, 567-68 (1922). Relying on precedents dealing with state action within the United States, the *Dunhill* plurality justified the line between commercial and governmental acts as follows:

In this same tradition, *South Carolina v. United States*, 199 U.S. 437 (1905), drew a line for purposes of tax immunity between the historically recognized governmental functions of a State and businesses engaged in by a State of the kind which theretofore had been pursued by private enterprise. Similarly, in *Ohio v. Helvering*, 292 U.S. 360, 369 (1934), the Court said: "If a state chooses to go into the business of buying and selling commodities, its right to do so may be conceded so far as the Federal Constitution is concerned; but the exercise of the right is not the performance of a governmental function . . . .

When a state enters the market place seeking customers it divests itself of its *quasi* sovereignty *pro tanto*, and takes on the character of a trader . . . ." It is thus a familiar concept that "there is a constitutional line between the State as government and the State as trader . . . ." *New York v. United States*, 326 U.S. 572, 579 (1946). See also *Parden v. Terminal R. Co.*, 377 U.S. 184, 189-190 (1964); *California v. Taylor*, 353 U.S. 553, 564 (1957); *United States v. California*, 297 U.S. 175, 183 (1936).

425 U.S. at 696.

It was against this backdrop that the Court could have reconsidered the question whether a distinction between commercial acts and governmental acts was proper for the state sovereign immunity it found reflected in the Eleventh Amendment. It did not do so, however, in any sustained way. In *College Savings*, Justice Scalia wrote:

The "market participant" cases from our dormant Commerce Clause jurisprudence, relied upon by the United States, are inapposite. . . . Those cases hold that, where a State acts as a participant in the private market, it may prefer the goods or services of its own citizens, even though it could not do so while acting as a market regulator. . . . The "market participant" exception to judicially created dormant Commerce Clause restrictions makes sense because the evil addressed by those restrictions—the prospect that States will use

custom duties, exclusionary trade regulations, and other exercises of governmental power . . . to favor their own citizens . . .—is entirely absent where the States are buying and selling in the market. In contrast, a suit by an individual against an unconsenting State is the very evil at which the Eleventh Amendment is directed—and it exists whether or not the State is acting for profit, in a traditionally "private" enterprise, and as a "market participant." In the sovereign-immunity context, moreover, "[e]venhandness" between individuals and States is not to be expected: "[T]he constitutional role of the States sets them apart from other employers and defendants." *Welch* [*v. Texas Dep't of Highways and Public Transp.*], 483 U.S. [468, 477 (1987)].

527 U.S. at 685-86 (citations omitted). The concerns underlying the dormant Commerce Clause, however, are quite different from those motivating sovereign immunity, as the Court understandably recognized. The latter doctrine received little attention. Aside from a couple of fleeting references in dissenting opinions and an even briefer response by the majority, it does not appear that the rationale underlying the recognition of a commercial-acts exception for purposes of foreign sovereign immunity was considered by the Court.

What attention there was primarily came from Justices Stevens and Breyer. In his dissenting opinion in that case, Justice Stevens remarked:

The procedural posture of this case requires the Court to assume that Florida Prepaid is an "arm

of the State" of Florida because its activities relate to the State's educational programs. . . . But the validity of that assumption is doubtful if the Court's jurisprudence in this area is to be based primarily on present-day assumptions about the status of the doctrine of sovereign immunity in the 18th century. Sovereigns did not then play the kind of role in the commercial marketplace that they do today. In future cases, it may therefore be appropriate to limit the coverage of state sovereign immunity by treating the commercial enterprises of the States like the commercial activities of foreign sovereigns under the Foreign Sovereign Immunities Act of 1976.

527 U.S. at 691-92 (Stevens, J., dissenting) (citing the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), and its definition of "commercial activity," *id.* § 1603(d)). Justice Breyer's dissent also mentioned that Congress had drawn a line between a state's public acts and its acts as a "market participant" in the FSIA:

In doing so, Congress followed the modern trend, which spread rapidly after the Second World War, regarding foreign state sovereign immunity. . . . Indeed, given the widely accepted view among modern nations that when a State engages in ordinary commercial activity sovereign immunity has no significant role to play, it is today's holding, not *Parden*, that creates the legal "anomaly."

527 U.S. at 699 (internal quotation marks and citations omitted).

Justice Scalia found those allusions to foreign sovereign immunity unhelpful; he dismissed the "suggestion . . . that we limit state sovereign immunity to noncommercial state activities because Congress has so limited *foreign* sovereign immunity" with this comment:

> This proposal ignores the fact that state sovereign immunity, unlike foreign sovereign immunity, is a *constitutional* doctrine that is meant to be both immutable by Congress and resistant to trends. The text of the Eleventh Amendment, of course, makes no distinction between commercial and noncommercial state activities . . . .

527 U.S. at 686 n.4 (opinion of Scalia, J.). The text of the Eleventh Amendment, of course, also says nothing about state sovereign immunity. If the matter were fully presented today, it is possible that the Court might view matters differently. In virtually all of the cases that followed *College Savings*, the Court recognized that nothing about the doctrine of state sovereign immunity—either its breadth or its limitations—appears in the Eleventh Amendment. See, *e.g., South Carolina State Ports Auth.,* 535 U.S. at 753 ("[T]he Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity."); *Garrett,* 531 U.S. at 363 ("Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States."); *Kimel,* 528 U.S. at 72-73 (quoting *Blatchford v. Native Village of Noatak and Circle Village,* 501 U.S. 775, 779

(1991), for the proposition that "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms").

These more recent developments in the law of state sovereign immunity lend some support to the possibility that the question of the scope of state sovereign immunity may not yet be resolved. As I have already noted, at least through the end of the nineteenth century the Court regularly applied principles of public international law (that is, the principles that apply among different nation-states of the world) to the U.S. states. Those principles permeate this country's foundational documents, and international analogies abound in the Federalist Papers. Thus, it appears that the burden of proof is on those who would deny that the rules governing the immunity of foreign countries apply in the context of the states, or that a time came when state sovereign immunity diverged from foreign sovereign immunity. As of 1787, these were just two applications of the same doctrine.

The Supreme Court has decided at least one case in which it looked back to the original plan of the Convention to see if a state retained its sovereign immunity or if it ceded a portion of that immunity to the federal government. This was *Central Virginia Community College v. Katz*, in which the Court held that an adversary proceeding in bankruptcy brought by a Chapter 11 trustee to set aside preferential transfers that the debtor had made to state agencies was not barred by the state's

sovereign immunity. 546 U.S. at 359. Essentially, the State of Virginia wanted to prevent the trustee from undoing the preferential transfers. It would have succeeded if the trustee's action ran up against the barrier of sovereign immunity. But, noting that bankruptcy jurisdiction is *in rem* and that the states at the time of the Founding had acquiesced in a grant of congressional power to regulate the bankruptcy process, the Court found that no such immunity existed. *Id.* 362-63. If one were to follow the same methodology for state sovereign immunity generally, one would start with the analogy to foreign sovereign immunity and move forward in each case. Only one question—but a big one—would remain: have the contours of state sovereign immunity changed over time, just as the contours of foreign sovereign immunity have done?

Given the fact that the doctrine of state sovereign immunity is one that has been developed over the years by the courts, largely based on structural assumptions, there is no obvious obstacle to taking the same move away from an absolute theory of immunity for states as the United States has done (first in the Tate Letter and later in the FSIA) for foreign governmental immunity. Many of the competitive concerns that motivated the latter move apply to the states with equal force. There is no apparent reason, for example, why the University of Wisconsin should be immune from lawsuits that Marquette University, a Catholic Jesuit institution located in Milwaukee, would have to defend. Nor is there any apparent reason why a state-owned hospital, or garbage pick-up service, or power plant, should have

a competitive edge over a private competitor. And, given the fact that litigation imposes transaction costs—often very high costs—on the parties, it seems undeniable that the failure to recognize a commercial-act exception for state entities confers the same kind of competitive advantage on the states that the United States was reluctant to confer on socialist or Communist countries when it embraced the restrictive theory of foreign sovereign immunity after World War II. See, *e.g.*, Joan E. Donoghue, *Taking the "Sovereign" Out of the Foreign Sovereign Immunities Act: A Functional Approach to the Commercial Activity Exception*, 17 Yale J. Int'l L. 489, 490 (1992) ("Communist governments generally supported an absolute theory . . . while Western governments promoted a restrictive theory . . . ."); see also 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES 390 (1987) (Introductory Note to Part IV, Ch. 5).

Capitalism and private ownership have served the United States well. Even though there is no clause in the Constitution explicitly committing this country to such an economic system (although the Takings Clause of the Fifth Amendment may come close), the antitrust laws have been called quasi-constitutional, and there seems little doubt that economic freedom is high on the list of cherished rights. See, *e.g.*, *United States v. Topco Associates, Inc.*, 405 U.S. 596, 610 (1972) ("Antitrust laws . . . are the Magna Carta of free enterprise."); *Northern Pac. R.R. Co. v. United States*, 356 U.S. 1, 4 (1958) ("The Sherman Act was designed to be a comprehensive charter of economic liberty[.]"). At a minimum, this public policy should provide a rule of construction for

courts considering questions of state sovereign immunity. At a stronger level, these considerations may yet persuade the Supreme Court to take up the question whether the scope of the sovereign immunity enjoyed by the states should be limited in the same way that sovereign immunity is limited for foreign nations, such that an exception to immunity would exist for commercial acts. My position in this case, however, does not depend upon the Court's taking the latter step. Even now, *Lapides* and the Court's other decisions that recognize waivers of sovereign immunity by litigation conduct require us to reinstate Phoenix's counterclaims on remand. For all of these reasons, I respectfully dissent.